# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CHARLETTA WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL HEALTHCARE REVIEW et al., <br><br> Defendants. | Case No. 2:15-cv-0054-RFB-PAL <br><br> **ORDER** |

## I. INTRODUCTION

Before the Court are Defendants' Motions for Summary Judgment. ECF Nos. 73, 74. For the reasons stated below, the Motions are granted.

## II. BACKGROUND

Plaintiff Charletta Williams asserts violations of the Telephone Consumer Protection Act ("TCPA") section 47 USC § 227(b)(1), Nevada Deceptive Trade Practices Act NRS 41.600, 598.0923(3), and declaratory judgment that the attempted consent was improper and invalid, and that Plaintiff and class members are entitled to $500 per call. The complaint alleges a national class consisting of all persons who received automated calls by or on behalf of defendants and for which defendants had not obtained express written consent.

On January 12, 2015, Defendants filed a Petition for Removal from the Eighth Judicial District Court Clark County Nevada. ECF No. 2. On February 2, 2015, Defendants filed Motions to Dismiss. ECF Nos. 12, 13. On September 29, 2015, this Court granted the UHS Defendants' Motion to Dismiss with leave to amend, denied the Motion to Dismiss as to Valley Health System Defendants, and denied the Motion to Dismiss as to Adreima Defendants. ECF No. 37. On October 13, 2015, Plaintiff filed an amended complaint. ECF No. 38. On October 27, 2015, Adreima and Valley Health System Defendants filed Motions to Dismiss. ECF Nos. 39, 40. On December 8, 2015, this Court denied both Motions to Dismiss. ECF No. 49. On April 29, 2016, Adreima and Valley Health Systems Defendants filed Motions for Summary Judgment. ECF Nos. 73, 74. On May 23, 2016, Plaintiff filed Responses to Defendants' Motion for Summary Judgment. ECF Nos. 75, 76. On June 9, 2016, Defendants filed Replies to Plaintiff's Response. ECF Nos. 77, 79.

**III.   LEGAL STANDARD**

**A. Motion for Summary Judgment**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

. . .

. . .

. . .

**IV.     UNDISPUTED/DISPUTED FACTS**

    **A.  Undisputed Facts**

The Court finds the following facts to be undisputed. On or about July 17, 2014, Charletta Williams obtained medical care at the emergency room at Desert Springs Hospital, 2075 E. Flamingo Road, Las Vegas, Nevada 89119, which is owned and operated by Defendant Valley Health System, LLC (the "Hospital"). Plaintiff arrived at the Hospital at 7:03 p.m. When Plaintiff arrived at the Hospital, she put her personal information into the Hospital kiosk, including her name, social security number, address, birth date, and phone number. After being seen and treated by a nurse and a doctor, the nurse instructed Charletta to go to the discharge booth, which she did. Plaintiff then went to the discharge booth where she received some papers to sign. Plaintiff recognizes the documents attached as Exhibit 1 (of [73] MSJ) to her deposition as the documents she received at the discharge booth. Plaintiff spent about three minutes skimming and reviewing the form. Plaintiff signed the document which is attached as Exhibit 1 to her deposition at 8:14 p.m., which was after she received treatment.

The Consent Form also provides an option for the patient to not sign the form, by including a space titled "Reason Patient Did Not Sign." This space is located directly below where Plaintiff signed. Plaintiff signed the form. The signed form contains the following paragraphs:

> "AUTHORIZATION FOR RECEIVING MESSAGES AND AUTOMATED CALLS: I give the Hospital (including its agents and third party collection agents) permission to contact me by telephone at the telephone number or numbers I provided during the registration process, or at any time in the future, including wireless telephone numbers or other numbers that may result in charges to me. … These voice messages and email and text communications may include information required by law (including debt collection laws) related to amounts I owe the Hospital as well as messages related to my continued care and treatment."

> "I also understand that the Hospital and its agents, including debt collection agencies, may use pre-recorded/artificial voice messages and/or use an automatic dialing devise (an autodialer) to deliver messages related to my account and amounts I may owe

the Hospital."

"I also authorize the Hospital and its agents to use the number or numbers provided for such pre-recorded or auto dial messages. If I want to limit these communications to a specific telephone number or numbers, I understand that I must request that only a designated number or numbers may be used for these purposes."

"RELEASE OF INFORMATION: I authorize the Hospital, physicians and other licensed providers furnishing these services to disclose my Protected Health Information ("PHI") as that term is defined by the federal law referred to as "HIPAA" for purposes of treatment, payment and health care operations to third parties including but not limited to insurance carriers, health plans (including government health programs such as Medicare and Medicaid), or workman's compensation carriers that may be responsible for payment of the services ("Third Party Payors"). The PHI disclosed may include information about my treatment, medical care, medical history, billing information, and other information received or acquired by the Hospital and maintained in any form, including written, oral or electronically maintained information."

"Upon inquiry the Hospital will describe my condition to callers or the public using one of the following words; undetermined, good, fair, serious or critical. If I do not want this information released I may make a written request for information about my condition to be withheld. I understand I can request a separate form to make this change."

Between July 21, 2014 and August 5, 2014, Adreima called Charletta's cell phone approximately five times using a prerecorded voice and an autodialer. Specifically, Adreima's call log indicates that it placed five calls to Charletta's cell phone: July 21, 2014 partial message left; July 22, 2014 message left; July 23, 2014 connected and no answer; July 24, 2014 message left; August 4, 2014 connected and no answer; August 5, 2014 call made and abandoned by receiver. The recorded message transcript is as follows:

Hello This Is Adreima calling on behalf of {Practice Name} Our records Indicate (Patient First I Last Name} had a recent visit to our facility please return our call to the toll free number (PRACTICE PHONE} our hours of operation are Monday through Friday

between 6 AM and 3 PM Pacific time We look forward to hearing from you. Thank you.

Charletta listened to the voicemail she received on August 5, 2014, which was a prerecorded message instructing her to call back a certain phone number if she was Charletta Williams. The message stated the call was from Adreima, but Charletta did not know what Adreima was or why Adreima was calling her. The message was the same prerecorded message that Charletta had received several times before. When Charletta called back on August 5, 2014, she spoke to an Adreima representative who asked Charletta about insurance and Medicaid.

[ADREIMA]: Hi, this is (inaudible), may I help you?

[WILLIAMS]: Hi, I was calling because a recording just called me, telling me to call this phone number back.

[ADREIMA]: Okay. Yes, ma'am, we are a Medicaid provider for Desert Springs Hospital. We aren't a collection agency. And we were calling to see if you had private insurance for your visit or to see if you had applied for Medicaid.

[WILLIAMS]: No, I haven't.

[ADREIMA]: Okay. And do you have private insurance?

[WILLIAMS]: No, I don't.

[ADREIMA]: Okay. What we do is, like I said, we are a Medicaid provider for Desert Springs, and with the Medicaid expansion for Nevada, you may be eligible to get that to cover your bill for you, and the only requirements are that you don't exceed the income or asset limit. And if you don't mind me asking, how many people are in your household?

[WILLIAMS]: Okay, I'm sorry, I'm at work, so right now –

[ADREIMA]: Oh, okay.

[WILLIAMS]: -- I can't focus on what you're saying, but I do have the bill, so –

[ADREIMA]: Okay, no problem. Thank you.

[WILLIAMS] All right.

The Hospital is one of five hospitals all owned and operated under the Valley Health System umbrella. All the Valley Health System hospitals contract with Adreima. Adreima provides a service to the Hospital (and all Valley Health System Hospitals) for which it is paid.

Specifically, Adreima contracts with the Hospital to contact any patients who do not have insurance and/or cannot pay their Hospital bill to attempt to obtain insurance or assistance for the patient, which in turn pays the Hospital, which in turn pays Adreima. Adreima employees work both on-site and off-site for the Hospital. In this case, there was no Adreima employee at the Hospital when Charletta was there. When no Adreima representative is at the Hospital, once the Hospital determines that a patient cannot pay the bill or the deposit, the Hospital downloads patient information electronically to Adreima. The downloaded information includes the patient's name, phone number, address, and date of visit, and Adreima has access to the patient's medical records, including the Attempted Consent Form.

Adreima then calls patients using a prerecorded voice message and an autodialer. Adreima calls the patient to confirm the patient does not have insurance and to obtain additional information to determine if the patient is eligible for assistance. The assistance may include state or federal programs, including Medicaid, or charity. If the patient is eligible, then Adreima assists the patient in gathering the necessary documentation, following up to obtain the necessary information and documents to complete the application, and submitting the application to the assistance program. If the application is approved, the patient would get insurance, and there's a possibility that the hospital bill may be paid for by the state. Pursuant to Adreima's contract with the Hospital, the Hospital pays Adreima based on the payments Adreima obtains for the Hospital. Specifically, when Adreima obtains insurance or assistance for a patient, the Hospital is paid on the patient's behalf, and the Hospital pays Adreima a percentage of the payments the Hospital receives. Adreima does not sell insurance. Adreima never asked for Plaintiff's credit number, did not quote her any prices for Medicaid, or ever ask for any other form of payment to apply for Medicaid.

Private entities such as the Hospital or Adreima do not and cannot sell Medicaid because Medicaid is a government program that is not sold

**B. Disputed Facts**

The parties dispute whether Plaintiff was compelled to sign the form as a condition of discharge. Plaintiff in her depositions stated that the receptionist told her she had to sign the papers, including the authorization form, before she could leave. "They said that you had to sign these

forms in order for you to be discharged and us to give you your prescriptions to go." Defendants emphasize that the form contains a prominent line, right below the signature line, labeled, "Reason Patient Did not Sign."

## V. DISCUSSION
### A. TCPA
#### i. Legal Standard

The three elements of a TCPA claim are: (1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii); Meyer v. Portfolio Recovery Associates, LLC, 707 F.3d 1036, 1043 (9th Cir. 2012).

The Ninth Circuit has held, however, that "[c]alls otherwise in violation of the TCPA are not unlawful if made 'for emergency purposes or made with the prior express consent of the called party,' 47 U.S.C. § 227(b)(1)(A); however, 'express consent' is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof." Grant v. Capital Mgmt. Servs., L.P., 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011) (unpublished disposition). There are two consent standards: 1) prior express written consent and 2) prior express consent. The difference between the two depends on whether the call was a telemarketing call.

As of 2012, prior express written consent of the recipient is required for all telemarketing and advertisement calls. 47 CFR 64.1200(a)(2). In The Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, the FCC held that "we revise our rules to require prior express written consent for all autodialed or prerecorded telemarketing calls to wireless numbers and residential lines . . ." 27 F.C.C. Rcd. 1830, 1831 (2012).

Prior express consent of the called party is required for non-telemarketing informational calls. 47 CFR 64.1200(a)(2); In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, 1831 (2012) (holding that such calls include "calls by or on behalf of tax-exempt non-profit organizations, calls for political purposes, and calls

for other noncommercial purposes, including those that deliver purely informational messages such as school closings.")

Telemarketing, as used in the TCPA, means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person. Chesbro v. Best Buy Stores, L.P., 705 F.3d 913, 918 (9th Cir. 2012) (citing 47 C.F.R. § 64.1200(f)(12) (2013)). "[A]pplication of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message." Chesbro v. Best Buy Stores, L.P., 705 F.3d 913, 918 (9th Cir. 2012) (citing 18 F.C.C.R. 14014 at 14098 ¶ 141 (2013)). The TCPA defines "advertisement" as follows: "The term advertisement means any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1). The Ninth Circuit, citing the FCC's 2003 Order, has held that this category includes "dual purpose" calls: "The FCC has determined that so-called 'dual purpose' calls, those with both a customer service or informational component as well as a marketing component, are prohibited. See 2003 Report and Order at 14097–98 ¶¶ 140–142." Chesbro v. Best Buy Stores, L.P., 705 F.3d 913, 917 (9th Cir. 2012)

While the TCPA does not define what constitutes prior express consent, the Ninth Circuit has held that "Pursuant to the [2008] FCC ruling, prior express consent is consent to call a particular telephone number in connection with a particular debt that is given before the call in question is placed." Meyer v. Portfolio Recovery Associates, LLC, 707 F.3d 1036, 1042 (9th Cir. 2012). The more recent 2012 FCC Order clarifies that the release of the phone numbers must be knowing. In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 F.C.C. Rcd. 1830, 1859 (2012) ("persons who knowingly release their phone number have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."). Further, in the context of the TCPA, the Ninth Circuit has held that express consent is "[c]onsent that is clearly and unmistakably stated." Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 955 (9th Cir. 2009) (citing Black's Law Dictionary 323 (8th ed. 2004). The Ninth Circuit recently found "that the FCC has established no rule that a consumer who gives a phone number to a company has consented to be contacted for any reason. Instead, FCC orders

and rulings show that the transactional context matters in determining the scope of a consumer's consent to contact." Van Patten v. Vertical Fitness Group, LLC, 847 F.3d 1037, 1046 (9th Cir. 2017).

"The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8). The written agreement shall include a clear and conspicuous disclosure informing the person signing that: by executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and the person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services. 47 C.F.R. § 64.1200(f)(8)(i) (2013).

The TCPA provides that "The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission . . . may by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect[.]" 47 USC § 227(b)(2)(C). The FCC recently issued an order in July 2015 ("the 2015 Order"). 30 F.C.C.R. 7961 (2015) at ¶ 146. In the 2015 Order, the FCC clarifies how certain non-telemarketing healthcare calls are not exempt from the TCPA under 227(b)(2)(C).

> "Finally, AAHAM asks the Commission to exempt from the TCPA's prior-express-consent requirement certain non-telemarketing, healthcare calls that are not charged to the called party. AAHAM notes that the calls provide vital, time-sensitive information patients welcome, expect, and often rely on to make informed decisions including: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration

instructions, pre-operative instructions, lab results, post- discharge follow-up intended to prevent readmission, prescription notifications, home healthcare instructions, available payment options, insurance coverage payment outreach and eligibility, account communications and payment notifications, Social Security disability eligibility, and "health care messages" as defined by HIPAA." Id. at ¶143.

"While these statements regarding the public's interest in and need for timely receipt of these calls are likely true regarding the majority of the types of calls AAHAM lists in its Petition, we are concerned that these policy arguments are not true for all types of calls AAHAM wishes to make under the TCPA's exemption provision." Id. at ¶ 146.

"For example, while we recognize the exigency and public interest in calls regarding post-discharge follow-up intended to prevent readmission, or prescription notifications, we fail to see the same exigency and public interest in calls regarding account communications and payment notifications, or Social Security disability eligibility (see footnote below). While this second group of calls regarding billing and accounts may convey information, we cannot find that they warrant the same treatment as calls for healthcare treatment purposes. Timely delivery of these types of messages is not critical to a called party's healthcare, and they therefore do not justify setting aside a consumer's privacy interests in favor of an exemption for them. We grant the exemption, with the conditions below, but restrict it to calls for which there is exigency and that have a healthcare treatment purpose, specifically: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions. We also clarify that HIPAA privacy rules shall control the content of the informational message where applicable, such as where the message attempts to relate information of a sensitive or personal nature; as one commenter cautions: 'the information provided in these exempted voice calls and texts must not be of such a personal nature that it would violate the privacy' of the patient if, for example, another person received the message. We therefore grant the exemption for calls

subject to HIPAA, but limit this exemption by excluding any calls contained therein that include telemarketing, solicitation, or advertising content, or which include accounting, billing, debt-collection, or other financial content." 30 F.C.C.R. 7961; FCC 2015 Order ¶ 146.

This section contains the following footnote regarding social security disability:

"AAHAM Petition at 3. While calls regarding Social Security disability eligibility may, in fact, raise issues regarding the timely provision of medical treatment, these issues are not readily apparent. Nothing in the record indicates what the content of these calls may be—whether they relate to eligibility for treatment, eligibility for non- healthcare services, or eligibility for other services. Without additional information, we are not able to determine whether the calls contain exigent information for a true healthcare treatment purpose, as opposed to information regarding billing and accounts information that is not of a true healthcare treatment purpose." 30 F.C.C.R. 7961, n. 489.

**B. Discussion**

Defendants argue that the calls were not "telemarketing or advertising" calls and therefore express *written* consent was not required under the TCPA. Plaintiff asserts that the contract relationship between the Defendants is what makes the call to sign up Plaintiff for Medicaid telemarketing and advertisement. This is because the Adreima Defendants are paid by Valley Health Systems Defendants to contact patients who do not have private insurance, and help them sign up for Medicaid. Defendants argue that this activity is not telemarketing and advertisement because they are not attempting to sell any good or service, but instead are helping individuals sign up for a government program.

The Court does not find that Adreima's calls regarding Medicaid and/or charitable health coverage constitute "advertising the commercial availability" of any good or service. Medicaid is not a "commercially available" program under the plain meaning of that phrase, as it is used to define "advertising." See 47 C.F.R. § 64.1200(f)(1). Medicaid is a non-market-based, public program, in which the government of a state subsidizes medical care for only certain citizens who

meet specific requirements. It is immaterial that Adreima may be paid when a called customer signs up for Medicaid and Medicaid payments for that person are made to the hospital – the call cannot be an advertising call if it does not promote a commercially available property, good, or service.

"Telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." Chesbro, 705 F.3d at 918. The Court finds that that the calls at issue here, seeking to encourage enrollment in a government program that provides free or heavily subsidized healthcare does not constitute encouragement of a "purchase," "rental," or "investment" of a "good, or service[]." Medicaid is generally provided to those otherwise unable to afford insurance, at little to no cost, and is not "purchased" under the plain meaning of that word.

While the Court need not and does not decide whether or not the calls at issue here fall within the medical exigency exception created by the FCC, the decision establishing that exemption informs the Court's decision that these were not telemarketing calls. In its 2015 order, the FCC reviewed a petition that "asks the Commission to exempt from the TCPA's prior-express-consent requirement certain non-telemarketing, healthcare calls that are not charged to the called party." 30 F.C.C.R. 7961, ¶143 (2015) (emphasis added).

The petitioner provided the examples of "appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post- discharge follow-up intended to prevent readmission, prescription notifications, home healthcare instructions, available payment options, insurance coverage payment outreach and eligibility, account communications and payment notifications, Social Security disability eligibility, and 'health care messages' as defined by HIPAA." Id. at ¶143

The FCC stated that it "recognized the exigency and public interest in calls regarding post-discharge follow-up intended to prevent readmission, or prescription notifications," but did not recognize a similar exigency or public interest in "calls regarding account communications and payment notifications, or Social Security disability eligibility." Id. at ¶ 146. And while the FCC did not include "insurance coverage payment outreach and eligibility" (one of the requested

exemptions), in the list of exemptions it explicitly granted,[1] nor did it explicitly deny the request as to that type of call. The ambiguous intent is further evidenced by the footnote addressing Social Security disability.

The order includes a footnote explicitly addressing Social Security disability, which the FCC listed among the non-exempted topics. The footnote reads, "[w]hile calls regarding Social Security disability eligibility may, in fact, raise issues regarding the *timely provision of medical treatment*, these issues are not readily apparent. Nothing in the record indicates what the content of these calls may be—whether they relate to *eligibility for treatment*, *eligibility for non-healthcare services*, or eligibility for other services. Without additional information, we are not able to determine whether the calls contain exigent information for a <u>true healthcare treatment purpose</u>, as opposed to information regarding billing and accounts information that is not of a true healthcare treatment purpose." 30 F.C.C.R. 7961, n. 489 (emphasis added).

The FCC appeared to articulate a standard for its public policy / exigency exemption, that the call must have a "true healthcare treatment purpose." The Court finds that the calls at issue here have a healthcare treatment purpose. It is possible that Medicaid coverage could apply retroactively and cover Plaintiff's prior treatment, and it is clear that coverage would encourage and enable follow-up treatment and future treatment, and also have the public policy benefit of increasing the likelihood of preventative care. Moreover, even where the exigency is less acute than, for example, a call regarding follow-up treatment or necessary medication, the public policy rationale may apply with even greater force than in some instances of follow-up for very minor medical issues. There is a strong public policy rationale for encouraging insurance coverage and the potential benefit, both to the solicited individual and to the state and society writ large, substantially outweighs the invasion of privacy and nuisance of the solicitation in a case like this one. The FCC in its ruling specifically invoked both medical exigency and public policy as the rationale for the exemption.

---

[1] "[A]ppointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions." The FCC does not appear to have intended to this as an exhaustive list. In footnote 490, the order states that a list of types of calls from among those submitted by petitioner that "would likely be exempt" because of "exigency and a true healthcare purpose." 30 F.C.C.R. 7961 at ¶ 146 n. 490.

Whether or not the calls at issue in this case fall within the exception created in the 2015 FCC order, the focus on public health policy, and the invocation of a possible exemption for calls related to government benefits used for medical treatment, inform the Court's reading of the FCC's definition of telemarketing. In light of the FCC rulings, and the plain meaning of "purchase," "rental," and investment," the Court finds that these calls were not telemarketing calls, and therefore only prior express consent is required.

At the hearing on March 28, 2016, Plaintiff's counsel conceded that if the calls at issue were not telemarketing or advertising, there was prior express consent sufficient to satisfy the requirements of the TCPA. It is undisputed that when Plaintiff arrived at the Hospital, she put her personal information into the Hospital kiosk, including her name, social security number, address, birth date, and phone number. In light of the limited transactional context of the initial giving of the number upon going to the hospital treatment, the Court finds that Plaintiff consented to calls regarding core treatment issues, as well as to payment for her treatment, and payment for follow-up or future treatment. In the absence of contrary intent, where an uninsured person seeks and receives treatment, it is reasonable to expect that a hospital that has been provided contact information would reach out regarding payment and/or insurance. In this case, read in light of the public policy imperative at issue, the Court finds the consent of providing the number and other contact information sufficient to satisfy the TCPA as elaborated by the FCC.

**C. Nevada Deceptive Trade Practices Act**

"An action may be brought by any person who is a victim of consumer fraud. As used in this section, "consumer fraud" means: . . . a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive." NRS 41.600(1), (2)(e). In her complaint, Plaintiff references NRS 598.0923(3), under which a person has committed a deceptive trade practice when she "violates a state or federal statute or regulation relating to the sale or lease of goods or services." Plaintiff in her Response Motion argues only that this has been violated through the violation of the TCPA. Therefore, because the Court grants summary judgment for defendants as to the TCPA claims, the Court also grants summary judgment as to the state claims in Count II.

## VI. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that ECF Nos. 73, 74 Motions for Summary Judgment are granted.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Defendants Adreima, LLC, and Valley Health Systems, LLC.

DATED: October 24th, 2017.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**